[Cite as *Smith v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-3149.]

| | |
|---|---|
| WILLIAM D. SMITH | Case No. 2013-00534 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff brought this action for negligence arising out of allegations that, while he was an inmate in the custody and control of defendant at the Belmont Correctional Institution (BCI), his hand was injured by Corrections Officer David Dougherty on April 4, 2009, and he did not receive timely medical care for his injuries. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} At trial, plaintiff testified that he came to BCI soon after he entered defendant's custody in 2007 pursuant to a burglary conviction. Plaintiff testified that he and Dougherty never had any physical altercations or serious problems leading up to the incident in question, but he stated that they may have had some words at times. Plaintiff stated that when the incident took place, on April 4, 2009, he was assigned to a cell in the segregation unit at BCI, where Dougherty worked during the second shift. As plaintiff recalled, at dinnertime on that date Dougherty went from cell to cell passing trays of food to the inmates through the "cuff ports" on their cell doors, but the tray he received had very little food on it, perhaps only a piece of bread. Plaintiff stated that he repeatedly communicated this to Dougherty through the cuff port, but Dougherty ignored him.

{¶3} Plaintiff stated that he eventually asked Dougherty to summon a "white shirt," or supervisor. Plaintiff stated that Dougherty declined to do so and grew angry with him, but he continued requesting a supervisor and looking through the cuff port to see if he could get the attention of any other staff members. Plaintiff stated that as he knelt on the floor with the cuff port at eye level, he rested his right arm in the cuff port and his right hand was extended out through the cuff port. According to plaintiff, after he saw Dougherty again and asked him once more to get a supervisor, Dougherty came up to the door and said "fuck you." Plaintiff related that without warning Dougherty then used his left hand to grab plaintiff's elbow and used his right hand to grab plaintiff's hand and caused the pinkie to be bent backward, Dougherty forced the pinkie or hand against the cuff port door and then the whole arm was forced through the cuff port itself. Plaintiff testified that the force applied to his pinkie was extremely painful and caused him to scream. Plaintiff stated that Dougherty's actions caused the skin to tear in the crease between his pinkie and palm, and as soon as the incident was over he went to the sink in his cell to rinse the blood from his hand. Plaintiff stated that he then wrapped the wound with tissues to stop the bleeding.

{¶4} According to plaintiff, he tried to get the attention of any staff members that he could through the remainder of the day, but had little success. Plaintiff stated that later in the evening he was able to speak with a corrections officer, apparently a Corrections Officer Ford, and explained what happened and asked for medical attention. But, plaintiff related that Ford said he was already aware something had happened between plaintiff and Dougherty and that he did not want to get involved, and Ford declined to do anything for plaintiff other than provide Dougherty's last name, which had been unknown to plaintiff. Plaintiff testified that overnight he was able to talk to a lieutenant or other supervisor who worked the third shift and he described what happened and asked for medical attention, but he stated that this individual responded

only by giving him some blank Informal Complaint Resolution (ICR) forms and said there was nothing else he could do.

{¶5} Plaintiff testified that he used one of the forms to submit an ICR the next day, on April 5, 2009, and that he did so by enclosing the document inside a "kite" (a written form of institutional correspondence) and addressing it to one of the supervising officers with responsibility over the second shift. (Joint Exhibit 2, p. 820.) Plaintiff also testified that he submitted separate kites to prison authorities in an effort to get some relief, including an April 5, 2009 kite addressed to the institutional inspector. (Joint Exhibit 2, p. 832.) The concerns raised either in the ICR or in the kite included complaints that Dougherty had broken or otherwise injured plaintiff's finger to the point that he could not move it, that plaintiff was being denied medical attention, that Dougherty had subsequently come to the cell door and threatened plaintiff, and that plaintiff felt he needed to be transferred out of BCI for his own safety. Plaintiff stated that there was no response for several days, however, and indeed the written staff response at the bottom of the ICR is dated April 14, 2009, ten days after the incident. Plaintiff stated that, in the meantime, he continued asking for help and trying to get medical assistance for his finger but no one would arrange for a nurse to see him or otherwise provide any help, and he remained in pain. In contrast to the difficulty he had getting medical attention for his finger, plaintiff stated that he encountered no such difficulty when he had the flu at one point earlier in his incarceration.

{¶6} Plaintiff stated that on April 5, 2009, at around 2:00 or 3:00 p.m., soon after the beginning of the second shift that day, when he left his cell during a recreation period Dougherty grabbed him and told him that he needed to drop the matter, that he "wasn't the sharpest knife in the drawer" if he kept it going, and that Dougherty was going to "fuck me up." Plaintiff stated that Dougherty continued to harass him in the ensuing days, going so far as to make threats of violence against his girlfriend and family.

{¶7} Plaintiff testified that about ten days after the incident, there were finally some actions taken in response to his concerns. Plaintiff stated that Dougherty was reassigned around this time to a different post in another location at BCI. Plaintiff also stated that, for the first time, he was able to see a member of the medical staff, when a nurse came to his cell on April 14, 2009, and performed a brief examination which resulted in a referral to a physician at BCI. Insofar as the corresponding Medical Exam Report prepared by the nurse included an observation that there was no broken skin or cuts visible, plaintiff testified that he disputes this finding and he noted that the examination took place a full ten days after the incident; additionally, it was noted in the document that the finger was swollen. (Joint Exhibit 2, p. 813.)

{¶8} Plaintiff testified that he saw a physician, apparently a Dr. Gujral, at BCI soon afterward and was told that he needed to be seen at the Corrections Medical Center (CMC) in Columbus and that it appeared he would need surgery. Plaintiff stated that the physician also prescribed Tylenol for pain relief, but it was not sufficient to address the level of pain he was experiencing. Plaintiff stated that one day later he was transported to CMC, where he underwent further evaluation, and he stated that he also was transported at some point to the Ohio State University Medical Center for an MRI. Plaintiff stated that he was ultimately diagnosed with a torn flexor tendon and was informed that he needed reparative surgery.

{¶9} On April 14, 2009, the same day that the nurse came to plaintiff's cell, plaintiff received a response to his original ICR stating that the matter was under investigation by the Institutional Inspector at BCI, a Ms. Riehle. Plaintiff testified that he continued to pursue the matter through the institutional grievance process, filing additional ICRs, grievances, and appeals in the ensuing days, as he felt that prison officials were not adequately responding to his concerns. Plaintiff recounted that two employees who were investigating the matter, one female and one male, whose names he could not remember, came to speak with him on one occasion. Plaintiff also stated

that he was asked to undergo a polygraph analysis around this time, but declined to do so under advice of counsel.

{¶10} Plaintiff testified that he was eventually transferred from BCI to the Toledo Correctional Institution (ToCI) and that he does not know the outcome of the internal investigation at BCI. Plaintiff stated that he remained at ToCI until his sentence expired on May 2, 2010. According to plaintiff, the medical staff at ToCI had informed him that he was to be scheduled for surgery, but he was released without ever getting the surgery and he does not know why. Plaintiff testified, though, that he did receive more effective pain relief medication while at ToCI.

{¶11} Plaintiff explained that, following his release from ToCI, he reoffended and returned to defendant's custody, and at some point in 2011 during this second period of incarceration he underwent the surgery that he was supposed to get earlier to repair the flexor tendon. As plaintiff described, however, despite the surgery and a subsequent course of physical therapy, he still cannot bend the finger into a closed fist position and he still experiences pain in the finger.

{¶12} Corrections Officer David Dougherty testified that, at the time of trial, he had been employed with defendant for 18 years, all at BCI. Dougherty related that his current post is in the visiting department, where he checks inmates in and out of visiting sessions and monitors their actions during the visits. Previously, though, Dougherty stated that he was posted in the segregation unit, where, among other things, his responsibilities included making periodic rounds to look in the cells and visually check on the inmates, delivering meals to the inmates on trays passed through the cuff ports on their doors, retrieving the trays afterward, and escorting inmates at designated times to a recreation area.

{¶13} Dougherty testified that at the time of the alleged incident he was going through the segregation unit after dinner and closing the cuff ports on the cell doors, and he explained that when the cuff ports are not being used to pass things in or out of

the cells or to handcuff inmates, they are generally kept closed for security reasons. According to Dougherty, plaintiff had a tendency to "play games" and "was a little reluctant to close his door." But, Dougherty testified that he was able to lift up the cuff port door and close it in a normal fashion without "doing anything excessive." Dougherty stated that to the best of his recollection he did not grab plaintiff's hand, and he denied bending plaintiff's finger backward or forcing plaintiff's hand into the cuff port. Dougherty further stated that he recalled plaintiff telling him that he was going to "sue the state" but that he liked Dougherty and would only sue him "for two dollars." As Dougherty explained, however, he thought that plaintiff was just playing some kind of game with him and that nothing out of the ordinary had happened, so he never gave much thought to those statements. Dougherty admitted that plaintiff had not posed any kind of physical threat to him during the incident.

{¶14} Dougherty acknowledged that any time an employee of defendant uses force against an inmate, it is required that the employee document the incident in a report that same day. But, it was Dougherty's testimony, at least initially, that he did not use force against plaintiff during this incident, so he did not prepare such a report.

{¶15} As far as having any problems with plaintiff, Dougherty stated that he had no issues with plaintiff before or after this incident, and he stated that he had no memory of any interaction with plaintiff in the recreation area. Dougherty also denied that plaintiff was only given a partial meal before this incident. Dougherty did state, however, that another corrections officer whose name he could not recall did go on the Internet at some point and search for personal information about plaintiff, including obtaining the name of plaintiff's girlfriend, and use that information to "tease" plaintiff, but it was Dougherty's testimony that this other officer did this, not him. Regarding access to medical attention, Dougherty testified that a nurse usually visits the segregation unit at least once every shift and officers can have that nurse see an inmate

who has requested medical attention, and he stated that officers can call for a nurse to come over immediately if an inmate has a medical emergency.

{¶16} Dougherty testified that when prison officials opened an investigation into this incident, he was temporarily reassigned to another post outside of the segregation unit. Plaintiff testified that he was interviewed by a Trooper Lish with the Ohio State Highway Patrol (OSHP), and that he was interviewed twice by the Institutional Investigator for BCI, Jim Langford. A transcript of a May 15, 2009 interview with Langford, at which a union representative was also present, was admitted into evidence. (Plaintiff's Exhibit 1.) Dougherty testified that he stands by the statements he made to Langford in that interview.

{¶17} When Langford asked Dougherty if he ever had any confrontations with plaintiff, Dougherty replied in the affirmative and specified that there had been times in the past when plaintiff spat at him and gave him "verbal abuse" when he walked down the hallway. When asked about this at trial, relative to his earlier testimony that there had been no problems between him and plaintiff, Dougherty testified that these were normal things that happen in prison and he downplayed their significance. Whereas Dougherty testified earlier that he did not use force against plaintiff and therefore did not need to document the incident, he acknowledged on cross examination that in his interview with Langford he said he "might have shoved [plaintiff's] arm in," that there was "a lot of tension and stress" in the segregation unit at the time, that he "never purposely tried to hurt someone or smash their hands in the cuff port," and that it "could it [have] ended in a use of force obviously I was so busy that particular day, I didn't get around to it and had forgotten or I felt at that particular time there was no need for a use of force cause I didn't think that there was any more issues." Dougherty testified that in general he was trying to tell Langford that he "could have done that," but he does not recall using force. At times in both his trial testimony and in his interview with Langford, when asked about whether he used any force against plaintiff, rather than denying it

outright Dougherty referred to video from a security camera in the hallway where plaintiff's cell was located and asserted that the video does not show him using force. (Joint Exhibit 1.)  When asked such questions at trial, Dougherty also similarly referred back to the transcript of Langford's interview and pointed out that he only told Langford he "could have done that," rather than denying outright from his own recollection whether he used force.  Dougherty denied any suggestion that he may have hurt plaintiff's hand in retaliation for plaintiff giving him a hard time, and he volunteered that "I probably have the best IPC skills of anybody in here."

{¶18} As stated earlier, plaintiff brings this action for negligence.  In addition to a claim of negligence predicated on the alleged use of force by Dougherty, plaintiff claims that the failure to provide him with medical treatment until ten days after the incident amounted to negligence, and that defendant also was negligent in failing to timely carry out a physician's order that he undergo surgery to repair the injured pinkie.

{¶19} "To recover on a negligence claim, a plaintiff must prove by a preponderance of the evidence (1) that a defendant owed the plaintiff a duty, (2) that a defendant breached that duty, and (3) that the breach of the duty proximately caused a plaintiff's injury." *Ford v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 05AP-357, 2006-Ohio-2531, ¶ 10.  "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." *Ensman v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 06AP-592, 2006-Ohio-6788, ¶ 5.

{¶20} The underlying allegations based on Dougherty's alleged use of force shall be addressed first.  It is noted that in addition to the theory of negligence pleaded in the complaint, it has been held that allegations of unnecessary or excessive force against an inmate may state a claim for battery. *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-804, 2014-Ohio-1810, ¶ 13.  "To prove battery, the plaintiff must prove that the intentional contact by the defendant was harmful or offensive.  Ohio courts have held that, in a civil action for assault and battery, the defendant has the

burden of proving a defense of justification, such as the exercise of lawful authority." (Citations omitted.)  *Miller v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-12, 2012-Ohio-3382, ¶ 11.

{¶21} "The use of force is sometimes necessary to control inmates."  *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 17. "Correctional officers considering the use of force must evaluate the need to use force based on the circumstances as known and perceived at the time it is considered." *Brown* at ¶ 15, citing Ohio Adm.Code 5120-9-01(C).  "[T]he precise degree of force required to respond to a given situation requires an exercise of discretion by the corrections officer."  *Ensman* at ¶ 23.  "In Ohio Adm.Code 5120-9-01, the Ohio Administrative Code sets forth the circumstances under which correctional officers are authorized to use force against an inmate." *Id.* at ¶ 6.

{¶22} Ohio Adm.Code 5120-9-01 provides, in pertinent part:

{¶23} "(C) Guidelines regarding the use of force. * * *

{¶24} "* * *

{¶25} "(2) Less-than-deadly force.  There are six general circumstances in which a staff member may use force against an inmate or third person.  A staff member may use less-than-deadly force against an inmate in the following circumstances:

{¶26} "(a) Self-defense from physical attack or threat of physical harm.

{¶27} "(b) Defense of another from physical attack or threat of physical attack.

{¶28} "(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

{¶29} "(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

{¶30} "(e) Prevention of an escape or apprehension of an escapee; or

{¶31} "(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶32} "Pursuant to Ohio Adm.Code 5120-9-01(C)(1)(a), correctional officers 'may use force only to the extent deemed necessary to control the situation.' Additionally, correctional officers 'should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.' Ohio Adm.Code 5120-9-01(C)(1)(b)." *Brown* at ¶ 16. Also pertinent is Ohio Adm.Code 5120-9-01(B)(3), which defines "excessive force" as "an application of force which, either by the type of force employed, or the extent to which such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident."

{¶33} Upon review of the evidence presented at trial, the magistrate finds as follows. In the weeks leading up to this incident, plaintiff resided in a cell in the segregation unit at BCI, where Corrections Officer Dougherty regularly worked during the second shift. Plaintiff and Dougherty did not have any serious confrontations before the date of this incident, but there had been some friction between them. On April 4, 2009, Dougherty was on duty when the inmates in the unit were served their evening meals, which were passed on trays through the cuff ports of the inmates' cell doors. After receiving his tray, plaintiff began complaining to Dougherty through the cuff port that he did not receive a full meal. Not receiving a response, at least one to his satisfaction, plaintiff asked Dougherty several times to summon a supervisor, but Dougherty declined to do so.

{¶34} Later, as the video from the security camera shows, Dougherty made rounds through the hallway where plaintiff's cell was located at approximately 7:10 p.m., essentially going door to door while carrying a box, the contents of which were not established at trial. The video shows that at 7:12 p.m., Dougherty stopped in the hallway at a point near plaintiff's cell, at which time plaintiff's arm can be seen through the cuff port, and the arm of another inmate across the hall can also be seen through the cuff port of that inmate's door. Based upon plaintiff's testimony, it was established

that around this time, plaintiff once again asked Dougherty to call for a supervisor.  It appears from the video that Dougherty said something to one or both inmates, and then put the box on the ground and approached plaintiff's door.  Dougherty did not set the box down at any of the other inmates' doors.

{¶35} From the video, it is established that Dougherty reached with both hands toward the cuff port, where plaintiff's right arm rested, and for approximately 35 seconds Dougherty can be seen maneuvering his own arms and body, and at one point bending down to look through the cuff port.  The video footage is more consistent with plaintiff's account of what happened than Dougherty's initial testimony that he basically closed the door in an ordinary manner.  Based upon plaintiff's testimony, as well as Dougherty's later acknowledgement when presented with his statements to Investigator Langford that he may have used force to put plaintiff's arm back through the cuff port, the greater weight of the evidence shows that Dougherty did use force against plaintiff.  Dougherty used his left hand to grab plaintiff's right elbow, he used his right hand to grab plaintiff's right hand or pinkie, and he then forced plaintiff's right hand and arm through the cuff port.  Dougherty's actions caused plaintiff's right pinkie to be bent backward and injured.

{¶36} Defendant asserted at trial that the video does not show Dougherty using such force, but in fact it does appear from the video that Dougherty put his hands on plaintiff as soon as he approached the door and that he subsequently exerted some physical force upon plaintiff.  While the precise details of this interaction cannot be discerned from the video, it is apparent that something more occurred than Dougherty simply closing the cuff port door, and the video certainly does not disprove plaintiff's version of events.

{¶37} Because the video does not establish the exact details of what happened, determining the facts requires careful consideration and weighing of the testimony of plaintiff and Dougherty.  In this regard plaintiff offered a more persuasive, direct, and consistent account of what occurred than did Dougherty, whose testimony came across

as somewhat evasive or defensive at times. Furthermore, the veracity of plaintiff's version of events is bolstered by what went on after the incident and in the days that followed, as the evidence shows it is more likely than not there was some effort to prevent or dissuade plaintiff from bringing this matter to the attention of others in the prison.

{¶38} Defendant also asserted at trial that plaintiff may have fabricated his story and self-inflicted the injury to his finger. As evidence, defendant points to a statement from plaintiff's cellmate, David Cottrell, which appears among various materials from the internal investigation which were filed as a joint exhibit at trial. In this statement, dated April 16, 2009, Cottrell stated that he witnessed plaintiff injure his own finger in the cell, that plaintiff's accusations against Dougherty were false, and that plaintiff was planning on bringing a lawsuit. (Joint Exhibit 3, p. 850.) There is no dispute, however, that on May 7, 2009, Cottrell was interviewed by Trooper Lish as part of OSHP's investigation into the matter. According to the statement form prepared by Lish, Cottrell told him an entirely different story, essentially that on April 16, 2009, while plaintiff was away at CMC, Corrections Officers Dougherty and Ford came to the cell and told him that they wanted him to write a statement absolving Dougherty of any fault and saying that plaintiff injured himself, that they suggested what he should write, and that they threatened to keep him in the segregation unit as long as they could if he did not cooperate. (Joint Exhibit 3, p. 853.) To the extent that there may be any consideration at all given to either of Cottrell's statements, Cottrell was not called to testify and the magistrate finds that the evidence presented at trial, including evidence that plaintiff and Cottrell were involved in a physical altercation at one point, does not establish that either statement is particularly reliable. It is clear that plaintiff's version of how the finger was injured outweighs the initial version told by Cottrell, which Cottrell himself later contradicted.

{¶39} In terms of any justification or privilege for Dougherty to use force, plaintiff did not pose a threat of physical harm nor was it shown that plaintiff ignored any warning or refused any order from Dougherty to remove his arm from the cuff port. Whether or not plaintiff had been giving Dougherty a hard time that day or even throughout his time in the segregation unit, behavior which Dougherty testified is not unusual in a prison environment, that behavior did not justify this use of force. From the evidence presented at trial, it was not established that any of the circumstances which may justify force under Ohio Adm.Code 5120-9-01 existed at the time of the incident. Indeed, the magistrate finds that the force was not justified or privileged, and it represented a breach of defendant's duty of reasonable care.

{¶40} On the subject of liability under the doctrine of respondeat superior, defendant made no argument opposing such liability at trial, nor did either party at any time request a civil immunity determination for Dougherty under R.C. 9.86 and 2743.02(F), and indeed the magistrate finds respondeat superior liability to be applicable. Dougherty was responsible for supervising and managing the inmate population in this housing unit and his duties included closing the inmates' cuff port doors after meals for security reasons. In the video, Dougherty appears to close cuff port doors on other inmates' cells, consistent with his duties. Dougherty's actions toward plaintiff too were ultimately motivated by his responsibility for closing the cuff port door, rather than simply acting to gratify any feeling of animosity. While Dougherty went about this task in an inappropriate way, by forcing through the cuff port the arm and hand of an inmate who had apparently been given no verbal command to get out of the way—much less resisted any such command, he did not intend to injure plaintiff and the overall purpose of his actions was in fulfillment of his role as a corrections officer, a job which at times does require the use of force. It is apparent from the evidence adduced at trial that conditions in the segregation unit were stressful, Dougherty was likely frustrated with plaintiff, and Dougherty simply overreacted and did not use

appropriate judgment when it came time for him to close plaintiff's cuff port door, but his actions were not so motivated by animosity or otherwise divergent from his job duties as to take him manifestly outside the scope of his employment, nor did he act with malice, in bad faith, or recklessly.    As such, the employer-employee relationship was not severed.    *See Caruso v. State*, 136 Ohio App.3d 616, 620-624 (10th Dist.2000); *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 16; *Elliot v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775 (10th Dist.1994).

{¶41} Finally, as stated earlier, it is alleged that the failure to provide plaintiff with medical treatment until ten days after the incident amounted to negligence, and also that defendant was negligent in failing to timely carry out a physician's orders that plaintiff receive reparative surgery.

{¶42} Plaintiff presented little evidence on these matters, and although the trial record was held open for some time to allow plaintiff an opportunity to adduce testimony specific to these claims, no additional testimony or other evidence was offered. Concerning the surgery, there were no medical records or testimony from medical professionals offered, and it was not sufficiently shown what course of treatment was prescribed for plaintiff by any physician and when that occurred, even less so that employees or agents of defendant failed to furnish plaintiff with a prescribed course of treatment in a way that would constitute ordinary negligence.    In terms of medical negligence, as opposed to ordinary negligence, there can be no liability in this case arising from the actual treatment, diagnosis, or care rendered by any physician or other medical professional due to the absence of expert testimony, which is necessary to support such a claim.

{¶43} Regarding the theory of negligence relative to the time it took for plaintiff to receive any medical attention at all after the incident, the evidence demonstrates that plaintiff told employees or agents of defendant that he needed medical attention after

the incident and that those individuals failed to furnish any medical attention for plaintiff until a nurse came to his cell ten days after the incident. Even if it is assumed that the delay constituted a breach of defendant's duty of care, however, plaintiff did not prove that this proximately caused any injury to him. There was no medical testimony to support a finding that a delay in plaintiff being seen by the nurse adversely affected his ability to recover from the injury to his finger or otherwise resulted in harm to him. While plaintiff testified that he was in pain in the days after the incident, he testified that the pain remained even after he started receiving medical care and continued long after that time. As plaintiff described, the physician who saw him at BCI gave him Tylenol for his pain but it was ineffective and the pain persisted, and not until a different provider at ToCI later gave him a stronger medication was the pain relieved. In short, it was not shown that plaintiff sustained any distinct harm as a proximate result of any delay in providing him with medical attention after the incident.

{¶44} Based upon the foregoing, the magistrate concludes that plaintiff has proven his claim of negligence by a preponderance of the evidence as to the use of force by Dougherty, but that plaintiff did not establish any negligence relative to his claims of delayed or untimely medical care. It is recommended that judgment be entered accordingly.

{¶45} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

Edward F. Borkowski, Jr.            James P. Dinsmore
P.O. Box 609151                     Timothy M. Miller
Cleveland, Ohio 44109               Assistant Attorneys General
                                    150 East Gay Street, 18th Floor
                                    Columbus, Ohio 43215-3130

Fernando O. Mack
323 West Lakeside Avenue, Suite 420
Cleveland, Ohio 44113

**Filed April 22, 2016**
**Sent to S.C. Reporter 5/25/16**